UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

PETER DeVITTORIO,

                Plaintiff,

-against-

STEPHEN MALFITANO, individually,
JOSEPH CANNELLA, individually,
THOMAS SCAPPATICCI, individually,
TOWN/VILLAGE BOARD OF THE
TOWN OF HARRISON, New York,
BOARD OF POLICE COMMISSIONERS
OF THE TOWN/VILLAGE OF HARRISON,
New York, and the TOWN/VILLAGE OF
HARRISON, New York

                Defendants.

------------------------------------------------------------x

**ORIGINAL**

07 Civ. (  )

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff PETER DeVITTORIO by his attorneys Lovett & Gould, LLP, for his complaint respectfully states:

### NATURE OF THE ACTION

1. This is an action for compensatory and punitive damages, resulting from jointly engaged-in conduct of the Defendants taken while acting in concert and under color of the laws of the State of New York, proximately resulting from violations of Plaintiff's rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

## JURISDICTION

2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

## THE PARTIES

3. Plaintiff PETER DeVITTORIO is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. He is employed as a Sergeant in the Police Department of the Defendant Town/Village of Harrison. He is also on the certified civil service eligible list for promotion to the rank of Lieutenant, a position for which he is highly qualified.

4. Defendant STEPHEN MALFITANO (hereinafter "Malfitano"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the duly elected Supervisor/Mayor of the Defendant municipal corporation. As such he is a voting member of the Defendant Town/Village Board and the Defendant Board of Police Commissioners.

5. Defendants JOSEPH CANNELLA (hereinafter "Cannella") and THOMAS SCAPPATICCI (hereinafter "Scappaticci"), who are sued in their individual and personal capacities only, at all times relevant to this complaint were a duly elected members of the Defendant Town/Village Board. As such they too are voting members of the Defendant Board of Police Commissioners.

6. Defendant TOWN/VILLAGE BOARD OF THE TOWN OF HARRISON, New York (hereinafter "Board"), is the duly elected governing body of the Defendant TOWN/VILLAGE OF HARRISON, New York (hereinafter "Town"), a municipal corporation duly existing by reason of and pursuant to the laws of the State of New York.

Defendant BOARD OF POLICE COMMISSIONERS OF THE TOWN/VILLAGE OF HARRISON, New York (hereinafter "Board of Police Commissioners), is comprised of the members of the Town/Village Board and bears statutory responsibility, pursuant to Section 5711q of the New York State Unconsolidated Laws and the Westchester Police Act (special state legislation enacted as c. 812, L. 1936, as amended) for the oversight and administration of the Police Department of the Town.

## THE FACTS

6. On February 2, 2007, Plaintiff filed <u>DeVittorio v. Hall</u>, 07 Civ. 00812)(hereinafter "<u>DeVittorio I</u>") in this Court, alleging violations of his rights as guaranteed by the First and Fourth Amendments to the United States Constitution, 42 U.S.C. §1983 as well as violations of the Omnibus Crime Control and Safe Streets Act of 1968 as amended. A copy of the complaint in that action is annexed and incorporated herein.

7. Subsequent to that filing, despite the fact that there are and continue to be several vacant Lieutenant positions in the Town's Police Department which for the effective and efficient operation of that Department and the health and safety of the Town should be filled, Defendants have failed and/or refused to promote Plaintiff.

10. Defendants' administrative determination to deny Plaintiff a promotion to the rank of Lieutenant was, either in whole and/or in substantial respect, motivated their intent to retaliate against Plaintiff for having filed <u>DeVittorio I</u>.

11. As a result of Defendants' determination Plaintiff has been caused to suffer: substantial pecuniary losses; irreparable and on-going injury to his career path in the

Police Department; public humiliation; public embarrassment; shame; anxiety; emotional upset; and he has otherwise been rendered sick and sore.

## AS AND FOR A CLAIM

12. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "11", inclusive.

13. Under the premises Defendants' retaliatory conduct violated, and daily continues to violate, Plaintiff's rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE a judgment is respectfully requested:

a. Awarding against the individually named Defendants such punitive damages as the jury may impose,

a. Awarding against all Defendants such compensatory damages as the jury may determine,

b. Awarding reasonable attorney's fees and costs, and,

c. Granting such other and further relief as to the Court seems just and proper.

Dated: White Plains, N.Y.
December 17, 2007

LOVETT & GOULD, LLP
By:_____
Jonathan Lovett (4854)
Attorneys for Plaintiffs
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

PETER T. DeVITTORIO, RALPH TANCREDI,
MICHAEL MARINELLI, and EDWARD ARCE,

                      Plaintiffs,    07 Civ. ( )

    -against-

                                              COMPLAINT

DAVID HALL, individually, ANTHONY
MARRACCINI, individually, and the
TOWN/VILLAGE OF HARRISON, New                  Jury Trial Demanded
York,

                      Defendants.  07 CIV. 0812

                                              JUDGE CONNER
------------------------------------------------------------x

Plaintiffs PETER T. DeVITTORIO, RALPH TANCREDI, MICHAEL

MARINELLI, and EDWARD ARCE, by their attorneys Lovett & Gould, LLP, for their

complaint respectfully state:

### NATURE OF THE ACTION

1. This is an action for compensatory and punitive damages proximately resulting

from the conduct of Defendants, engaged in jointly under color of the laws of the State of

New York, for violations of Plaintiffs' rights as guaranteed by the First, Fourth, and

Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983, and the

Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §2520.

### JURISDICTION

2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

1

## THE PARTIES AND CERTAIN BACKGROUND FACTS

3. Plaintiff PETER T. DeVITTORIO is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was employed by the Defendant Town/Village (hereinafter "Town") and served as an active and vocal member of the Town's Police Benevolent Association (hereinafter "PBA") since he is a sworn member of the Town's Police Department. Because of his non-disruptive expressions of concern regarding public health and safety related issues in the community and racial profiling in connection with local law enforcement activities, in the Fall of 2004 he was punitively skipped for promotion to the rank of Lieutenant by Defendants.

4. Plaintiff RALPH TANCREDI is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was the President of the PBA and in that capacity has non-disruptively expressed his opinion with respect to a series of crimes (delineated *infra*) committed by the Defendants, including their secret installation of a surveillance camera (with both audio and video capacity) in the men's locker room at Police Headquarters.

5. Plaintiff MICHAEL MARINELLI is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was an active and vocal member of the PBA in which capacity he has non-disruptively expressed his opinion with respect to the same series of crimes.

6. Plaintiff EDWARD ARCE is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. He is the Sergeant-At-

2

Arms of the PBA and at all times relevant to this complaint in his capacity as a member of the PBA has non-disruptively expressed his opinion with regard to the same series of crimes.

7. Defendant DAVID HALL (hereinafter "Hall"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was the Town's duly appointed Chief of Police.

8. Defendant ANTHONY MARRACCINI (hereinafter "Marraccini"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed as a Captain in the Town's Police Department.

9. Defendant TOWN/VILLAGE OF HARRISON, New York (herein the "Town") is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of said State. The Town's Police Headquarters building contains, *inter alia*, a men's locker room where male officers - - with an expectation of privacy - - completely undress in order to shower and to change into and/or out of uniform.

## ADDITIONAL MATERIAL FACTS

10. Prior to December 24, 2005, without the knowledge, permission and/or consent of the Plaintiffs or any of them, Defendants surreptitiously installed a surveillance camera, with both audio and video capability, in the men's locker room at Police Headquarters. The installation and use of that camera had nothing whatsoever to do with the conduct of Hall and/or Marraccini's lawful authorized duties as members of a law enforcement agency.

3

11. Thereafter Defendants: i) video taped Plaintiffs and other officers while they were in the various states of undress or exposed; ii) both recorded and listened to their private conversations for purposes of spying on them; iii) gathered and memorialized their (the officers') thoughts regarding departmental corruption; iv) obtained for dissemination photographs of them while they were compromised by reason of their state of undress; and, *inter alia*, v) seized otherwise personal information regarding their intentions/objectives as members and/or officers of the PBA.

12. On December 24, 2005, Marinelli discovered the camera as secreted in the locker room and reported its presence to Sergeant Edward Lucas, the then "Tour Supervisor". Lucas took photographs of the camera.

13. On December 25, 2005, Marinelli reported the discovery of the camera to Tour Supervisor Sergeant Vincent Musollino, who also photographed the camera. In that connection Arce witnessed a number of other officers photographing the camera.

14. On December 26, 2005, Tancredi, in his capacity as PBA President, was informed by Police Officer Arlotta about the discovery of the surveillance camera. That same day Arlotta notified Hall about the discovery.

15. As a result Hall - - falsely professing: "When I find out who did this, he is going to be fired" - - entered the locker room and tore the surveillance camera from both its mooring and wiring - - following which Hall and another officer entered the attic of Police Headquarters to remove the wiring that had lead from the audio/video equipment to an in-house video screen and a recording device.

16. Within minutes Tancredi, in his capacity as PBA President, arrived at Headquarters at which time Hall improvidently blurted: "Ralph, it was never hooked up. No audio, no audio. We could never get it to work".

17. Hours later Marraccini, in reference to the PBA and the PBA President, cautioned Marinelli: "You created some mess!".

18. Because the presence of the surveillance camera in the locker room constituted evidence of criminal wrong doing, on or about December 27, 2005, Tancredi as PBA President and PBA attorney Richard Bunyan demanded in writing that Hall and Marraccini safeguard and not destroy all evidence pertaining to the camera. In response Hall summoned Bunyan, Tancredi in his capacity as PBA President, and the Executive Board of the PBA and demanded that the writing be retracted. Improvidently disclosing his willingness to tamper with evidence, Hall then screamed:

> "I'll take the evidence outside and burn it in
> 
> front of Rich[ard] Bunyan!"

19. When Hall was advised that the PBA intended to report the locker room surveillance camera to an outside law enforcement agency, Hall responded by threatening the PBA's Executive Board, PBA President Tancredi and PBA counsel Bunyan: "I'll turn Anthony [Marraccini] loose on them [PBA members pursuing the surveillance camera issue)".

20. On December 29, 2005, Marraccini advised members of the PBA that he personally had installed the locker room camera. As he improvidently admitted:

> ". . .I did not covertly videotape anyone in the locker
> 
> room. . .I [Marraccini] am not a homosexual. . .[and] I

Marraccini] was not watching your balls".

Marraccini then showed Tancredi the surveillance camera, which had both audio and video output jacks, claiming: "This was never hooked up" - - a representation definitively contradicted by: i) the photographs taken by members of the PBA of the surveillance camera as secreted in the locker room, which photographs depict both audio and video output wiring connected to the camera; ii) Marraccini's later admission that the surveillance camera in fact captured "an image" as depicted on Marraccini's computer in the Police Department; and iii) Hall's conduct, as observed by members of the Department, when he ripped the surveillance camera free from its wiring.

21. As a proximate result of Marinelli's discovery and report regarding the camera, effective on or about December 31, 2005, Defendants began punitively assigning him to so-called "walking posts" - - an assignment usually reserved for junior members of the Department - - with the objective of humiliating him and signaling Defendants' intention to take retaliatory action to suppress PBA members' expression of concern about the unlawful audio and videotaping in the locker room.

22. As a proximate result of Tancredi's expressions of concern as PBA President regarding the installation of the surveillance camera, Defendants punitively assigned him to "Post 1" and/or "Post 2" with the intention of humiliating and degrading him since those assignments routinely are given to junior officers. In that connection Tancredi was twice advised by supervising Sergeants: "They [Hall and Marraccini] don't want you in the [Police Headquarters] building", "They [Hall and Marraccini] don't want you anywhere where you can come in the building".

23. On January 31, 2006, Marraccini advised Marinelli that a permanent investigative assignment which Marraccini several months earlier had proposed be given to Marinellii had instead been given to another officer - - a punitive action that Marraccini mockingly characterized as a demonstration of "ingenuity by the Chief".

24. In February 2006 the locker room surveillance camera was first discussed at a PBA meeting - - following Tancredi and Bunyan's informal inquiry of the District Attorney's Office regarding its illegality.

25. As a member of the PBA DeVittorio expressed his opinion at the meeting that the placement of the camera in the locker room made the PBA membership "victims" of wrongdoing actionable criminally and/or civilly. Following a rancorous discussion of these issues the PBA adopted a resolution to report the installation of the locker room surveillance camera officially to an outside law enforcement agency and to ascertain whether the camera's installation violated the rights of the PBA membership. At or about the same time one of Marraccini's departmental supporters (Lt. Marshall) advised Tancredi during a meeting in Marraccini's office that Bunyan had given the PBA bad legal advice regarding the camera and should, as a result, be "fired".

26. Commencing in or about March and/or April of 2006 Marraccini (aware of the PBA's pursuit of the surveillance camera issue and determined to stop it) began making a series of false accusations against Tancredi in his capacity as PBA President - - claiming that Tancredi had misspent PBA moneys. At or about the same time Marraccini and Marshall also began threatening disciplinary action against the other members of the PBA's Executive Board if they refused to falsely report to the District Attorney's Office that Tancredi had supposedly illegally spent PBA funds. Thereafter at

7

Marraccini and Hall's request, the District Attorney's Office made inquiry into the issue of the expenditure of those moneys, concluding that criminal wrongdoing had not occurred.

27. Under these circumstances Marraccini made three demands of the PBA's Executive Board:

> i) Retract the letter demanding that evidence concerning the surveillance camera not be destroyed - - a retraction that would have facilitated the destruction of the camera with impunity and potentially circumvented a criminal charge of Tampering with Evidence,
>
> ii) Fire the PBA attorney - - to silence Bunyan with respect to the surveillance camera and strip the PBA of legal guidance with respect to it, and for,
>
> iii) Tancredi to resign as PBA President - - in order to silence him, deprive those members of the PBA (primarily Tancredi's now co-plaintiffs who supported him with respect to his challenge to Defendants' misconduct concerning the surveillance camera) of their leadership, to chill Tancredi's PBA supporters and abort through silence and intimidation any further investigation with respect to the camera.

28. On or about April 25, 2006, Tancredi and Bunyan provided to the Public Integrity Unit of the District Attorney's Office evidence regarding the surveillance camera - - including photographs, and *inter alia* police reports.

8

29. By the time that the May 2006 PBA meeting was held Marraccini had, by means of threats and coercion, induced four of the members of the PBA's Executive Board (the Vice President, the Recording Secretary, the Treasurer, and the Financial Secretary) to publicly albeit falsely accuse Tancredi of engaging in criminal wrongdoing with respect to the expenditure of PBA funds.

30. In June and/or July of 2006 the Executive Board of the PBA, as influenced by Marraccini, fired Bunyan as its counsel with a view towards undercutting further criticism of the Defendants by outspoken members of the PBA (including each of the Plaintiffs) regarding the locker room surveillance camera.

31. Prior to the October 2006 PBA meeting (at which nominations for elective office are routinely made), Marraccini influenced certain individuals to run as candidates on his "slate" with a view towards taking complete control of the PBA and putting an end to PBA members' expressions of concern regarding the surveillance camera. Marraccini's slate lost the election.

32. Thereafter Sergeant Michael Olsey, who had previously been a supporter of Plaintiffs' pursuing the surveillance camera issue, began a series of public, verbal attacks on Tancredi claiming that Tancredi: "Funded his lifestyle through the PBA". Hall and Marraccini within days assigned Olsey to the position of "Commander of the Detective Division" and also put him in charge of the Department's School Resource Officer program - - despite DeVittorio's seniority and better qualifications for that assignment. At or about the same time Detective Lieutenant Douglas Buschel (who had previously expressed criticism of the Defendants regarding the surveillance camera) accepted a

nomination to become a member of the PBA's Executive Board. The very next day he was removed by Hall and Marraccini as Commander of the Detective Division.

33. On or about November 27, 2006, while at the Harrison Funeral Home, Marraccini confronted Arce and advised that he (Arce) was "stirring the pot" (a reference to Arce's outspokenness as a PBA member regarding the surveillance camera), cautioned him to "get with the right [Marraccini] team", to stop the "rhetoric [regarding the camera"] and to "get with the right people", that is Marraccini, Hall and their supporters in the Department.

34. In or about November and December 2006 Marraccini directed subordinate officers to visit local business establishments and request for purposes of supposed investigation copies of PBA bills. Marraccini then falsely accused Tancredi of misusing a PBA credit card and threatened Sergeant Schanil with a suspension from duty if he did not report this supposed wrongdoing to the District Attorney's Office.

35. Stepping up his attacks on the PBA, Marraccini then began contacting former, financial contributors to the PBA to persuade them to stop donating money in support of the union - - and instead to donate money directly to the Police Department.

36. As a proximate result of Defendants' conduct none of the Plaintiffs will again express criticism of Hall, Marraccini and/or the Town with respect to the surveillance camera, Defendants' punishment of the PBA for advocating an independent investigation of same, for Defendants' insinuating themselves into the 2006 PBA election process with a view towards taking control of the PBA and silencing it, and/or reporting Defendants' criminal wrongdoing (Coercion, Attempted Coercion, Official Misconduct, Unlawful

Surveillance, and *inter alia* Eavesdropping) to any outside law enforcement agency unless compelled by grand jury and/or trial subpoenas to do so.

37. As a proximate result of Defendants' conduct and/or retaliatory conduct Plaintiffs have been forced to suffer: violations of their right to privacy; violations of their right to be free from illegal eavesdropping; violations of their right to be free from illegal searches/seizures; violations of their associational rights and right to both free speech and to petition government for the redress of grievances; emotional upset; public humiliation; public shame; public embarrassment; pecuniary losses including loss of overtime and loss of promotion; destruction of their professional careers and career paths; irreparable injury to their professional and personal reputations; anxiety; and they have otherwise been rendered sick and sore.

## AS AND FOR A FIRST CLAIM

38. Repeat and reallege as if fully set forth the allegations of fact contained in paragraphs "1" to "37", inclusive.

39. Under the premises Defendants' conduct violated Plaintiff's right to privacy as guaranteed by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A SECOND CLAIM

40. Repeat and reallege as if fully set forth the allegations of fact contained in paragraphs "1" to "37", inclusive.

41. Under the premises Defendants' conduct and retaliatory conduct violated Plaintiffs' rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

### AS AND FOR A THIRD CLAIM

42. Repeat and reallege as if fully set forth the allegations of fact contained in paragraphs "1" to "37", inclusive.

43. Under the premises Defendant' conduct violated Plaintiffs' rights as guaranteed by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §2520.

### AS AND FOR A FOURTH CLAIM

44. Repeat and reallege as if fully set forth the allegations of fact contained in paragraphs "1" to "37", inclusive.

45. Under the premises Defendants' conduct violated Plaintiffs' rights as guaranteed by the Fourth Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE a judgment is respectfully requested:

    a. Awarding against the individually named Defendants such punitive damages as the jury may impose,

    b. Awarding against all Defendants such compensatory damages as the jury may determine,

    c. Awarding reasonable attorney's fees and costs, and,

    d. Granting such other and further relief as to the Court seems just and

    proper.

Dated: White Plains, N.Y.
   January 28, 2007

              LOVETT & GOULD, LLP
              By: _____
                Jonathan Lovett (4854)
              Attorneys for Plaintiffs
              222 Bloomingdale Road
              White Plains, N.Y. 10605
              914-428-8401